In re MILWAUKEE LODGE NO. 46 OF THE BENEVOLENT AND PROTECTIVE ORDER OF ELKS OF THE UNITED STATES.

District Court, E. D. Wisconsin.

Nov. 25, 1935.

Supplemental Opinion Dec. 24, 1935.

James Shaw, of Milwaukee, Wis., for debtor.

Malcolm Whyte, of Milwaukee, Wis., for Bondholders' Protective Committee.

GEIGER, District Judge.

The proceedings instituted on March 28, 1935, moved with such expedition that the debtor on September 7th presented a petition for final decree. Notice thereof was served upon the attorney for a "bondholders' protective committee," attorneys for certain other creditors; upon the First Wisconsin Trust Company, trustee under the debtor's mortgage and deed of trust, under an original mortgage, and under new mortgages, chattel and real, executed for the purpose of carrying out the reorganization plan; also to such trust company in its capacity as "depositary" for the bondholders' protective committee above referred to. Such petition also comprehends requests or suggestions for allowances of "reasonable compensation * * * for services rendered and reimbursement for the actual and necessary expenses incurred in connection with the reorganization proceedings by parties in interest, namely, First Wisconsin Trust Company as Trustee under said mortgage or Deed of Trust, dated May 1, 1924, the bondholders' protective committee, its agents and attorney, and the attorneys for the debtor".

And the parties have submitted to the court memoranda on the power of making allowances for compensation and expenses, the propriety of its exercise, under clause 9 of subdivision (c) of said section 77B, Bankr. Act, 11 USCA § 207 (c) (9), which reads in part: "The judge, in addition to the jurisdiction and powers elsewhere in this section conferred upon him, * * * (9) may allow a reasonable com-

pensation for the services rendered and reimbursement for the actual and necessary expenses incurred in connection with the proceeding and the plan by officers, parties in interest, depositaries, reorganization managers and committees or other representatives of creditors or stockholders, and the attorneys or agents of any of the foregoing and of the debtor."

Upon a consideration of the several questions raised, the facts may be grouped:

(1) Those pertinent to an allowance to the debtor for its expenses, including reasonable compensation to its counsel for services in these proceedings, in the administration of the estate in court, and in the perfection of a plan of reorganization under the law, and the orders allowing the debtor to remain in possession and manage the property; and to bring it within the comprehension of a decree for reorganization.

(2) Those bearing upon the compensation, if any, to be allowed to First Wisconsin Trust Company on its claim for a stipulated annual amount for services from 1932 to 1936 under the trust deed executed by the debtor to such trust company under date of May 1, 1924.

(3) Those bearing upon the compensation, if any, to be allowed to such trust company for its services in acting as a "depositary" under an agreement dated May 25, 1931, entered into by and on behalf of holders of first mortgage bonds under deed of trust dated May 1, 1924, noted in (2), supra.

(4) Those bearing upon allowance, if any, to be made to such bondholders' protective committee last above referred to for its expenses in functioning as such committee, and specifically reimbursement for borrowed money and for the compensation of its secretary and its counsel, respectively.

(5) Those bearing upon an alternative, apparently assumed (by the debtor in its petition) to be clearly open to the trust company in respect of its waiver of compensation under (3), supra.

■ Under this amended bankruptcy provision, the right of a debtor to be reimbursed for its expenses in the initiation and maintenance of the proceedings, and, specifically, for counsel fees, is recognized as clearly as under ordinary bankruptcy

proceedings, though, with respect to the latter, the custodianship, the care of property, and the operation of a business, except in limited situations, are not contemplated to be left with the debtor; therefore, reasonableness of amount is the only question tendered. It appears from the petition that, in perfecting a plan of reorganization, provision for compensation of the debtor's counsel through the new bond issue was made. Such bonds mature in 20 years, with interest at 3 per cent. annually; and in view of the estate involved, the sum suggested to be allowed to reimburse debtor for services of counsel, viz., $3,500, payable in such bonds, is reasonable.

Respecting the four other groups above noted, a reference to the facts, as they are brought out in the record, will be helpful in determining what, if any, allowances are to be made.

The trust company accepted a trust deed executed May 1, 1924; and apparently the debtor defaulted May 1, 1931. On May 5th following, a deposit agreement was entered into between the bondholders' protective committee, which is now asking for an allowance, and such depositing bondholders as might become parties thereto by accepting the agreement and depositing bonds. The agreement is somewhat conventional, endowing such committee with almost unlimited power of representation of bondholders, and awarding immunity against liability for the exercise thereof, assuring compensation, and the like. Strangely, the trustee under the trust mortgage was named and accepted the office of "depositary," and, as such, subordinated itself, by the agreement, to the will of the committee both, in respect of matters presumably within, as well as those outside of, an ordinary trust mortgage. Such committee claims to have functioned from the date of its creation to the present time, and is asking for allowances as follows:

| | | |
|---|---|---|
| Counsel fees | | $ 900.00 |
| Partial compensation of secretary | | 1,450.00 |
| Miscellaneous disbursements of committee itemized: | | |
| Note to 1st Wis. Nat'l Bk. | $1,000.00 | |
| Int. to Sep. 1, '35 | 166.33 | |
| Advanced for postage | 6.24 | |
| Letter service, paper, postage, printing | 68.18 | 1,240.75 |

It is further said that the $1,000 bank loan made to the committee was spent for

printing, publication of notice, compensation to secretary, supplies, interest, depository expense, etc.

It may be noted that the trust company has not appeared in these proceedings either as trustee under the mortgage or as depositary under the bondholders' protective agreement. Its claim is advanced in the petition filed by the debtor for final decree, as including the sum of $600 as an "annual stipulated service charge fee from May 1, 1932 to May 1, 1936—four years at $150 per year"; and, further, an allowance as indicated in the following paragraph of such debtor's petition: "First Wisconsin Trust Company, as depositary for the Bondholders' Protective Committee, rendered service to said committee of the alleged value of three thousand one hundred fifty and 80/100 ($3150.80) dollars, but foregoes claim therefor in consideration of *its employment as Trustee under the debtor's new mortgage,* and in *consideration* of the debtor's assurance ·that said Trust Company *may enjoy* the sum of two thousand eight hundred forty-four ($2844.00) dollars *unclaimed interest money· paid over to it as Trustee* under the mortgage of May 1, 1924, prior to the debtor's default which began May 1, 1931." (Italics supplied.)

 We have, therefore, a situation in which a committee organized more than four years prior to the institution of these proceedings, three years before the passage of the amended act, a trust company in a dual capacity as trustee under a mortgage and as a depositary under a bondholders' protective committee, making claims for allowances under the section hereinbefore quoted. Whether the section in question is new, its exact scope and applicability may be open to much discussion. However, courts should not lose sight of the policy so clearly pointed out in the original Bankruptcy Act (30 Stat. 544), first of prohibiting any allowances except such as are specified in the act, and, secondly, enjoining economical administration in the interest of creditors. Assuming that the section literally confers upon the judge a power otherwise prohibited in bankruptcy, it should not be assumed that it was the intention of Congress even to hint that the court would be expected to recognize every participation by a "party" as suspectible to compensation allowances. It should not be

assumed that it was intended by this section to introduce into bankruptcy proceedings, even permissibly, a wholesale distribution to all who might claim that they were parties in interest, regardless of the adversary character of such interest, or the quality of participation. Putting it specifically, the act did not intend that every creditor or "party" who, under the compulsion of process, and, manifestly in furtherance of his own interest, came into the proceeding, was entitled to compensation, either for himself or for his counsel, whether he agreed or disagreed with the debtor, the plan, or the attitude taken by a majority, or a minority. It is difficult to see upon what theory a trustee under a mortgage, which is superseded by the plan, and particularly in a case where such trustee did not participate and where he could not participate, other than to suggest that his cestuis were creditors and that the debtor's estate is subject to the adversary mortgage, it is difficult to see how such trustee, how a protective committee, how the identical trustee in a dual capacity as a "depositary," the latter two pursuant to a protective agreement executed four years prior to the institution of proceedings, can claim allowances for services or disbursements *"incurred in connection with the proceedings and the plan,"* even conceding, in other respects, the literalism of clause 9.

In considering this general aspect, the indulgent attitude taken by the debtor in a brief submitted by its counsel, deserves some attention. After stating that although the plan for reorganization contained a provision ·seeking to compensate parties and counsel under the provisions of clause 9, the brief continues:

"Had the debtor failed to make express provision in its plan for the determination by the Court of the amount of any expense to be paid by it, it would be free to make payment privately. Its bondholders numbered about twenty-five hundred. They were widely scattered. The debtor would have been required to consume much time and incur considerable expense to reach its bondholders and secure an expression of their attitude in the debtor's plan had it not been able to deal directly with the Bondholders' Protective Committee representing a large number of the bonds.

"In dealing with the Bondholders' Protective Committee, whose compensation, by the terms of the plan, was to be fixed by the Court, the debtor felt that it was free from impropriety. But, if the plan had not so provided, and it had been possible for the debtor to make private compensation to the Bondholders' Protective Committee, the whole transaction would have taken on a sinister aspect and the *rights of depositing bondholders* would have been *subject to the action of a committee compensated by their adversary.*

"The provisions of the Act in respect of the method of taking a vote of creditors upon a proposed plan are very meagre. Cause 9 is one of the few expressions in the Act which enable the Court to bring the methods by which an approving vote is secured into the light of day. We think that in every instance the court, before approving a plan, should require that it provide for the submission to the Court of all expenses and that the Court thus exercises a check upon payments made by a debtor to reorganization or bondholders' committees and also thereby subject the activities of such committees to the court's scrutiny. To refuse generally to exercise such jurisdiction will needlessly incur abuses under an Act which contains little enough in the way of assurance against unfairness in the conduct of voting and little to compel armslength dealing between the debtor and reorganization or bondholders' committees.

"The depositing bondholders (who are in the majority) had the right to believe, from the very terms of the plan, that they would be immune from any liability to the Committee or the depositary, and that the reasonable compensation of such persons would be fixed by the Court and paid out of the estate. These provisions of the plan were strictly in accordance with the Act. The proceeding has been consummated openly upon the express assumption that the jurisdiction conferred by clause 9 would be exercised."

With respect, the court is unwilling to accept the attitude thus taken by counsel. That contention upon the scope of clause 9 may arise; that parties may have a right to appeal to the court for exercise of the power said to be conferred by that clause is one thing; but

the matter of including in a plan, whether proposed by the debtor or anybody, an offer of compensation or reimbursement to those who must indicate their acceptance or rejection, all with the idea that such an indulgent attitude taken in advance by the debtor may stimulate an indulgent attitude toward the plan, is quite another. In short, if the statute is intended, as counsel suggests, there is no need of making the *exercise of the power* the subject of any advance bargaining or agreement between any of the parties; and I doubt very much whether, as counsel suggests, a debtor may agree in advance to compensate, his "adversary." Basically, every corporate debtor coming before the court for reorganization under section 77B (11 USCA § 207), initiates, as between himself and all creditors, and other parties, an adversary proceeding. It is as much so as is ordinary bankruptcy. The statute confers the right to invoke the jurisdiction compulsorily; and all parties are in the same position with reference to each other, singly or collectively, and to the court, as is found generally, in litigation and particularly in proceedings to administer property. It is my judgment that the matter of making allowances to parties in an adversary relation and to those who appear in proceedings to assert or establish, personally, interests in or with respect to a trust estate involves something more than solicitude respecting only the *manner of doing it.* It seems to be assumed in the matter before us that the statute contemplates openness for the purpose of avoiding what is characterized as a "sinister" method of doing it. It is assumed that every one who may be brought into the proceeding, and whether he appears individually or representatively, is rendering a service "in connection" with the proceeding or in connection with a plan; and that such service, so the statute intends, is compensable by the court. Therefore, by way of testing out the assumption and the suggestion of counsel, suppose a creditor participates actively in the consideration of a plan; he is prompted to oppose its adoption and fails. He seeks compensation for his efforts in connection with the proceeding in opposing the plan; Is he to be compensated upon the theory that he is justifiably and in good faith opposed to the plan? Or is he to be denied compensation because he was not on the right

side? As against him, should the court allow compensation to creditors who appeared individually or representatively on the other side? Or, should the court make reasonable allowances to every one?

I think counsel is wrong in his assumption that a debtor invoking 77B, either before or during proceedings, is "free" to bargain with adversaries in respect of compensation or counsel fees. Probably no one would claim that an offer made by a debtor to his adversary, "I will pay you or your counsel if you will accept the plan," would receive the favorable consideration of any court no matter how openly the offer was made. The character of the offer, indeed its entire subject-matter, is not bettered by a willingness to pass it to the court; nor can a statute purge its expression or its implications of questionable inducements calculated to influence adversaries.

As has been intimated, this discussion and analysis of the suggestions of the debtor, the probable concurrence therein by parties and counsel to be made the recipients of allowances, has been entered upon to demonstrate the questionable character of the statute, if it is to be construed and applied as affording warrant for awards to parties who are in fact in an adversary relation to the corporate debtor, whether or not *it* be the moving petitioner. And all that has been said proceeds upon the free concession that concert of action by creditors or other parties in interest, no matter how manifested, as well as active participation by individuals, and regardless of alignment by either individual or associated parties with, or in opposition to, the specific aspirations or proposal of the corporate debtor, may be very helpful in the disposition of the matter before the court. But, as has also been observed, the fundamental consideration is, that the statute should not be construed to put courts in a position where, initially, all "parties" in varying degrees may ask for or expect and obtain allowances for their adversary participation. The fact that "parties," upon any promptings, may readily give their assent to the debtor's proposals, does not eliminate the basic *adversary* relation wherein assent is given. In my judgment, sound policy demands that this be recognized under 77B just as it is compelled to be recognized in ordinary bankruptcy composition, and as it should be recognized (and I believe usually is) in equitable and probate administration of trusts. The association of parties under more or less conventionally iron-clad "protective" agreements, usually emphasizes the purpose to aggregate such parties in their *adversary relation;* and rarely, if ever, can such agreements be viewed as inherent *aids* to trust administration, calling for award of allowances for services in carrying the burden; and rarely, if ever, do such agreements, or the course of participation in proceedings thereunder, reflect any purpose or any objective other than obtaining, *for the parties to such agreement,* the best or the most for their *single or their aggregate claims* asserted for satisfaction, in whole or in part, *against the adversary* whose trust is before the court for administration.

█ The statute, in so far as it deals or attempts to deal with allowances to a debtor, or to a trustee appointed by the court, for the care of the estate and the conduct of proceedings, is plainly declaratory of recognized equitable, and, to the extent covered by it, of bankruptcy principles under the original act. But the notion that it was intended to go without limit in the grant of power to courts to award allowances for *participation in,* or for services *"in connection with,"* "proceedings," regardless of their quality as reflecting the real assumption of a *trust burden,* is rejected. I am mindful of the feeling entertained by some lawyers, that the intent of the section was to carry into these proceedings the quite unrestrained liberality shown in equity receiverships in the past; and it may be that in drafting clause 9 some one had the forethought or desire to introduce the practice there followed, quite regardless of fundamental justification. That view should not be entertained, no matter how much debate the words of the act may arouse. The fact that the equitable principles may have been abused should not carry the abuse into statutory power, if it can be avoided. It can be so avoided, if the line be drawn as hereinbefore indicated. It cannot be avoided if the large field be characterized as covered by "discretion," which, as herein intimated, inescapably puts the courts in a position to grant, more or less indiscriminately, and without serious ques-

tion from any source, favor, in adversary relationship.

Without attempt at further elaboration, the foregoing considerations lead to a disallowance of all the claims herein made, excepting, as indicated, to the debtor and its counsel. The matter is illustrative of the consequences of an attempt to burden an estate with allowances, which, if made, fall upon creditors who by the plan accept a 60 per cent. loss on their bonds. It is probably true that an individual bondholder, having a claim of $500, out of an issue of a million, would not suffer very much through an allowance of a few thousand dollars. But there are bondholders, who none the less should realize that the loss which they must sustain should not, in any degree, comprehend unwarranted allowances, which after all either help to make up the loss or burden the debtor's future; and whether or not they realize it, should not affect the course to be pursued by the court upon the present application. The application for allowance to the protective committee is deemed to be wholly without merit.

And the suggestion, if not the application of the debtor, that the trust company, although waiving the claim for services, be permitted to retain, and, as it is put, "enjoy," a fund of something like $3,000 paid to it as interest on outstanding bonds prior to default, but apparently never paid over to any one, is equally without merit. Obviously, this fund would seem to belong to bondholders, and the debtor is hardly in a position to ask that the owners be foreclosed and that it be given to the trust company.

With respect to the "service charge" of $600, requested by the trust company, the nonappearance of the trust company in these proceedings has been noted; and the allowance should not be made upon the conception that the estate of the debtor was burdened therewith, as by way of a preferential lien.

An order may be entered allowing to the debtor the amount hereinbefore indicated, payable in its bonds for reimbursement of its counsel; and all other items are disallowed.

### Supplemental Opinion.

The memorandum filed by the court on November 25, 1935, relative to allowances to the debtor and others, has brought from the First Wisconsin Trust Company, through its counsel, who is also an officer, complaint respecting matters of fact and the course of comment thereon in such memorandum. Such complaint is directed to the statement that the trust company had not appeared or participated in these proceedings; and, secondly, to allegations in the debtor's petition respecting the trust company and a fund which was an accumulation of unclaimed interest on the trust mortgage whereunder the trust company was trustee. It is charged that the allegation in the petition respecting an arrangement, whereby the trust company, upon debtor's "assurance," was to be permitted "to enjoy" such fund, is false.

Thereupon the court felt that in fairness, the debtor and any other party interested, particularly the trust company, should be given opportunity to appear, present, and discuss the matter as they might severally desire; and accordingly, on December 17th, counsel for the debtor, the bondholders' protective committee, and for the trust company, appeared before the court at chambers; and as a supplement to the memorandum, particularly in respect of the asserted nonappearance of the trust company, it is now said:

(1) That the trust company, in its capacity as mortgage trustee, filed in the proceedings a formal claim, setting forth its mortgage interest and the number of bonds issued and outstanding on whose behalf it sought to represent the liability of the debtor.

(2) That concurrently, or practically so, the trust company, as such mortgagee, filed a claim in the sum of $5,000, alleged to be the reasonable and customary charges for services rendered in such capacity; and prayed for its allowance by the court.

(3) That on September 7, 1935, the trust company filed an answer to the petition filed by the debtor on September 5, 1935, to which answer reference will hereafter be made.

It may be said, preliminarily, that the matters discussed in the former memorandum were believed to arise upon the face of the petition filed by the debtor and upon certain affidavits on behalf of the bondholders' protective committee both of whose counsel, orally and in briefs, discussed the questions presented. There was no discussion in court, in briefs or argument, on behalf of the trust company; and, except for

the fact of nonappearance as commented upon in the original memorandum, the facts which were deemed pertinent to a consideration and determination of the questions propounded were deemed to be without controversy. It is a fact that the court was in ignorance of the appearance of the trust company, if the filing of the two claims as above noted constituted an appearance; and ignorant of the answer filed by the trust company in response to the debtor's petition for allowance, if that constituted, and it did, an appearance in that phase of the proceedings. Upon further consideration (particularly in view of the present concession, in the answer, of the pertinent facts), the matter of the appearance of the trust company has little, if any, relevancy to the issue. The real point to the debtor's petition was the obtaining of approval for certain allowances; and the main criticism in the memorandum of the court affecting the trust company is with respect to the use of a specific trust fund in its hands, in making an allowance to the mortgage trustee to compensate it for services; and when, as above indicated, the mortgage trustee represented to the court that the petition of the debtor was false, that such trustee had in fact returned such specific fund to the debtor, and did not and does not "enjoy it," it became important to ascertain the fact.

It now appears, from the trust company's own answer, that, with respect to the basic fact to be considered by the court, the debtor's petition, particularly paragraph 6, quoted in the former memorandum, though not presenting the matter in the same form, does not, in any sense, inaccurately disclose that fact. To make this evident, the trust company's answer may be quoted:

"This answering trustee is informed and believes that the averments of said petition are substantially true excepting as hereinafter controverted or qualified. .

"This answering trustee denies that it has any knowledge or information sufficient to form a belief as to the costs and expenses incurred by said petitioner, other than those made or incurred to this answering trustee.

"The averments in paragraph 6 (quoted in the court's original memorandum) of said petition inadvertently misstate the agreements between said petitioner and this answering trustee.

"First Wisconsin Trust Company, at the instance and request of the bondholders' protective committee, rendered services to said committee of the value of $3158.80, in accordance with the established schedule of fees of said company for such services.

"In consideration of the financial difficulties of the petitioner, and its endeavor so to reorganize its business and obligations in this proceeding as to enable it to proceed with its corporate enterprise, First Wisconsin Trust Company agreed with the representatives of said petitioner that said bill should be commuted at $2,800.

"The reason for adopting that sum as a commutation was that said First Wisconsin Trust Company, trustee, had in its possession a balance of $2,844 deposited by said petitioner to meet interest coupons matured prior to May 1, 1931, which amount said petitioner desired to withdraw and use to settle said bill of First Wisconsin Trust Company for services to the bondholders' protective committee.

"In order to justify the release of said balance to said petitioner and at the same time fully to protect the bondholders of outstanding coupons matured prior to May 1, 1931, said petitioner substituted for said balance its undertakings that each and every of said coupons should, when and if presented for payment, be paid by First Wisconsin Trust Company, trustee, but that said petitioner should forthwith on demand reimburse to the trustee the amount so paid; which undertaking was and is duly secured by the bond in the penal sum of $5,000, of said petitioner as principal, and Seaboard Surety Company, as surety."

Such answer is signed and verified by the officer who, as counsel, complained and complains of the memorandum filed by the court; and it leaves no doubt upon these propositions:

(1) That the trustee had in its possession as a trust fund $2,844, paid to it in cash by the debtor, and specifically applicable to the payment of interest coupons.

(2) That neither the trust company nor the debtor had the power or the right to divert such fund to the payment of a personal obligation which was asserted by the trustee, in another capacity, against a bondholders' protective committee, and for which the debtor was not held liable.

(3) That the agreement whether the debtor's petition or the trust company's answer be taken as reflecting its elements and objective was and is a device whereby the trust fund in cash was used or to be used for the personal benefit of the mort-

gage trustee in respect of a matter outside of its mortgage trust; and the circumstance that the trust company exacted and received the promise and collateral indemnifying agreement from the debtor merely emphasizes the means whereby the immediate objective of the trust company, to receive satisfaction of an obligation against the bondholders' committee, was carried out.

When, therefore, the debtor in asking for a final decree, properly submitted to the court this specific matter of allowance to the trust company to be made in the manner indicated, it unquestionably recognized, at least, the possibility of disapproval. Disapproval followed. And as the trust company has presented no fact or circumstance, which is relevantly at variance with the facts disclosed in the debtor's petition, nor suggestive of any infirmity in the conclusion heretofore announced, the latter is adhered to.